## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF NOVA SCOTIA, NEW YORK AGENCY; BARCLAYS CAPITAL INC.; BMO CAPITAL MARKETS CORP.; BNP PARIBAS SECURITIES CORP.; CANTOR FITZGERALD & CO.; CIBC WORLD MARKETS CORP.; CITIGROUP GLOBAL MARKETS INC.; COMMERZ MARKETS LLC; CREDIT SUISSE SECURITIES (USA) LLC; DAIWA CAPITAL MARKETS AMERICA INC.; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO.; HSBC SECURITIES (USA) INC.; JEFFERIES LLC; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MIZUHO SECURITIES USA INC.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; RBS SECURITIES INC.; SG AMERICAS SECURITIES, LLC; TD SECURITIES (USA) LLC; and UBS SECURITIES LLC,<br><br>Defendants. | CASE NO:  15-6474<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

1.      Plaintiff Oklahoma Firefighters Pension and Retirement System ("OKFPRS" or "Plaintiff), on behalf of itself and all others similarly situated, brings this class action under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15(a) and 26, and the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, *et seq.* against the Primary Dealers (as defined below) in the market for securities issued by the United States Department of the Treasury ("Treasury Department"), such as Treasury Bills, Notes, Bonds, Treasury Inflation-Protected Securities, and Floating Rate Notes ("U.S. Treasury Securities"). The price of U.S. Treasury Securities is a key input to pricing financial products derived from such securities ("U.S. Treasury-Based Instruments"), such as Treasury futures and options. Plaintiff transacted in U.S. Treasury Securities or U.S. Treasury-Based Instruments (together, "U.S. Treasury Instruments") with one or more Defendant between January 1, 2007 and the present (the "Class Period"). Plaintiff alleges as follows based upon personal knowledge as to its own conduct and upon information and belief as to all other matters.

## I. NATURE OF THE ACTION

2.      Prices of U.S. Treasury Securities serve as a worldwide benchmark for both borrowers and savers, helping to determine the cost of credit throughout the global economy.

3.      In the wake of the recent financial crisis, it has become clear that many of the benchmark prices central to the operations of countless international markets have been rigged, including LIBOR, ISDAfix, and foreign exchange benchmarks. U.S. Treasury Securities are regarded as one of the safest investments, playing a particularly important role to investors when markets are turbulent. However, the prices for U.S. Treasury Securities are no less prone to manipulation than the others.

4.      The Treasury Department holds regular auctions for U.S. Treasury Securities in which Defendants, as Primary Dealers (defined below), submit secret, supposedly competitive bids to the Treasury Department on behalf of themselves and their clients.

5.      The market for U.S. Treasury Securities is one of the largest and most liquid in the world, with roughly $12.7 trillion in outstanding debt in which nearly all trading is done by the

Primary Dealers, who trade roughly $500 billion per day.[1] The market's size, combined with the fact that there are a limited number of participants in the initial auction market and associated forward market (known as the when-issued market), makes it "a fertile area for harmful collusive behavior."[2] This is exacerbated by the fact that the market is very lightly regulated; there is no central authority to police illegal trading activity.

6.     As Primary Dealers, Defendants are expected to be "good citizens of the Treasury market"[3] and compete against each other in the U.S. Treasury Securities markets; however, instead of competing, they have been working together to collusively manipulate the prices of U.S. Treasury Securities at auction and in the when-issued market, which in turn influences pricing in the secondary market for such securities as well as in markets for U.S. Treasury-Based Instruments. As a result of Defendants' collusive and manipulative conduct, Plaintiff and the Class have been harmed.

## II. PARTIES

### A.     Plaintiff

7.     OKFPRS was established in 1981 to provide pension benefits to over 20,000 firefighters and their beneficiaries, managing over $2.1 billion in assets. During the Class Period, OKFPRS transacted in U.S. Treasury Instruments at artificial prices caused by Defendants' collusive, manipulative, and anticompetitive conduct, resulting in injury to OKFPRS' business or property.

---

[1] SIFMA, *US Treasury Trading Volume (xls) - monthly data to July 2015 Updated 8/06/15*, http://www.sifma.org/uploadedFiles/Research/Statistics/StatisticsFiles/TA-US-Treasury-Trading-Volume-SIFMA.xls?n=24563.

[2] Alexandra Scaggs, Daniel Kruger, & Keri Geiger, *As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk Is a Good Place to Start*, BLOOMBERG (August 4, 2015), http://bloom.bg/1TMV51m.

[3] Simon Potter, Executive Vice President, Fed. Res. Bank of New York, Remarks at the 2015 Primary Dealer Meeting, New York City: Challenges Posed by the Evolution of the Treasury Market (April 13, 2015), http://www.newyorkfed.org/newsevents/speeches/2015/pot150413.html.

**B.      Defendants**

8.      Defendant Bank of Nova Scotia, New York Agency is an uninsured state agency of The Bank of Nova Scotia and maintains its principal offices in New York, New York. As used in this Complaint, "Bank of Nova Scotia" includes Defendant Bank of Nova Scotia, New York Agency and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Bank of Nova Scotia served as a Primary Dealer of U.S. Treasury Securities and transacted U.S. Treasury Instruments with Plaintiff and members of the Class.

9.      Defendant Barclays Capital Inc. is a Connecticut corporation with its principal offices in New York, New York. As used in this Complaint, "Barclays" includes Barclays Capital Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Barclays served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

10.      Defendant BMO Capital Markets Corp. is a Delaware corporation with its principal offices in New York, New York. As used in this Complaint, "BMO" includes BMO Capital Markets Corp. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, BMO served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

11.      Defendant BNP Paribas Securities Corp. is a Delaware corporation with its principal offices in New York, New York. As used in this Complaint, "BNP" includes BNP Paribas Securities Corp. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, BNP served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

12.      Defendant Cantor Fitzgerald & Co. is a general partnership organized under the laws of the State of New York and maintains its principal offices in New York, New York. As used in this Complaint, "Cantor" includes Cantor Fitzgerald & Co. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Cantor served as a

Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

13.    Defendant CIBC World Markets Corp. is a Delaware corporation with its principal offices in New York, New York. As used in this Complaint, "CIBC" includes CIBC World Markets Corp. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, CIBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

14.    Defendant Citigroup Global Markets Inc. is a New York corporation with its principal offices in New York, New York. As used in this Complaint, "Citigroup" includes Citigroup Global Markets Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors, including Citibank N.A. During the Class Period, Citigroup served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

15.    Defendant Commerz Markets LLC, formerly known as Dresdner Kleinwort Securities LLC, is a Delaware corporation with its principal offices in New York, New York. As used in this Complaint, "Commerz" includes Commerz Markets LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Commerz, under its former name, served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

16.    Defendant Credit Suisse Securities (USA) LLC is a Delaware company with its principal offices in New York, New York. As used in this Complaint, "Credit Suisse" includes Credit Suisse Securities (USA) LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Credit Suisse served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

17.    Defendant Daiwa Capital Markets America Inc. is a New York corporation with its principal offices in New York, New York. As used in this Complaint, "Daiwa" includes Daiwa

Capital Markets America Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Daiwa served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

18.    Defendant Deutsche Bank Securities Inc. is a Delaware corporation with its principal offices in New York, New York. As used in this Complaint, "Deutsche Bank" includes Deutsche Bank Securities Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Deutsche Bank served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

19.    Defendant Goldman, Sachs & Co. is a New York corporation with its principal offices in New York, New York. As used in this Complaint, "Goldman Sachs" includes Goldman, Sachs & Co. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Goldman Sachs served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

20.    Defendant HSBC Securities (USA) Inc. is a Delaware corporation with its principal offices in New York, New York. As used in this Complaint, "HSBC" refers to HSBC Securities (USA) Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, HSBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

21.    Defendant Jefferies LLC is a Delaware company with its principal offices in New York, New York. As used in this Complaint, "Jefferies" refers to Jefferies LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Jefferies served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

22.    Defendant J.P. Morgan Securities LLC is a Delaware company with its principal offices in New York, New York. As used in this Complaint, "JPMorgan" includes J.P. Morgan Securities LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors.

During the Class Period, JPMorgan served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

23.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation with its principal offices in New York, New York. As used in this Complaint, "Merrill Lynch" includes Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Merrill Lynch served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

24.     Defendant Mizuho Securities USA Inc. is a Delaware corporation with its principal offices in New York, New York. As used in this Complaint, "Mizuho" includes Mizuho Securities USA Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Mizuho served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

25.     Defendant Morgan Stanley & Co. LLC is a Delaware company with its principal offices in New York, New York. As used in this Complaint, "Morgan Stanley" includes Morgan Stanley & Co. LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Morgan Stanley served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

26.     Defendant Nomura Securities International, Inc. is a New York corporation with its principal offices in New York, New York. As used in this Complaint, "Nomura" includes Nomura Securities International, Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, Nomura served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

27.     Defendant RBC Capital Markets, LLC is a Minnesota company with offices in New York, New York. As used in this Complaint, "RBC" includes RBC Capital Markets, LLC

and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, RBC served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

28.     Defendant RBS Securities Inc. is a Delaware corporation with its principal offices in Stamford, Connecticut. As used in this Complaint, "RBS" includes RBS Securities Inc. and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, RBS served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

29.     Defendant SG Americas Securities, LLC is a Delaware company with its principal offices in New York, New York. As used in this Complaint, "SG Americas" includes SG Americas Securities, LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, SG Americas served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

30.     Defendant TD Securities (USA) LLC is a Delaware company with its principal offices in New York, New York. As used in this Complaint, "TD Securities" includes TD Securities (USA) LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, TD Securities served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

31.     Defendant UBS Securities LLC is a Delaware company with its principal offices in New York, New York. As used in this Complaint, "UBS" includes UBS Securities LLC and its parent companies, subsidiaries, affiliates, predecessors, and successors. During the Class Period, UBS served as a Primary Dealer of U.S. Treasury Securities and transacted in U.S. Treasury Instruments with Plaintiff and members of the Class.

32.     Bank of Nova Scotia, Barclays, BMO, BNP, Cantor, CIBC, Citigroup, Commerz, Credit Suisse, Daiwa, Deutsche Bank, Goldman Sachs, HSBC, Jefferies, JP Morgan, Merrill Lynch, Mizuho, Morgan Stanley, Nomura, RBC, RBS, SG Americas, TD Securities, and UBS are referred to collectively as "Defendants" or "Primary Dealers."

**C.     Agents and Co-Conspirators**

33.     Various other persons and entities other than Defendants have performed acts, made statements in furtherance of the conspiracy, or otherwise participated in the conspiracy alleged in this Complaint. Plaintiff reserves the right to identify such persons and entities as additional Defendants.

### III. JURISDICTION AND VENUE

34.     This Court has subject matter over this action under Sections 4 and 16 of the Clayton At, 15 U.S.C. §§ 15(a), 26; Section 22 of the CEA, 7 U.S.C. § 25; and 28 U.S.C. §§ 1331, 1337.

35.     Venue is proper in this Judicial District under 15 U.S.C. §§ 15(a), 22, and 26; Section 22 of the CEA, 7 U.S.C. § 25(c); and 28 U.S.C. § 1391(b), (c), (d) because during the Class Period, one or more Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed in this Complaint has been carried out in this District.

36.     The Court has personal jurisdiction over each Defendant because each Defendant transacted in business throughout the United States, including in this District, by transacting in U.S. Treasury Securities or U.S. Treasury-Based Instruments with Plaintiff and members of the Class both in this District and throughout the United States. The conspiracy was directed at, and had the intended effect of, injuring individuals and entities throughout the United States, including in this District, and the effects of this conduct gives rise to Plaintiff's claims.

37.     The acts of Defendants and their co-conspirators were within the flow of, were intended to, and did in fact, have a substantial effect on the foreign and interstate commerce of the United States.

### IV. FACTUAL BACKGROUND

38.     U.S. Treasury Securities are initially issued by the Treasury Department at public auction; however, trading of such securities begins prior to issuance in a forward market known

as the "when-issued" market. After these securities are issued, they are traded in a secondary market much like other bonds. Prices of U.S. Treasury Securities serve as critical inputs for U.S. Treasury-Based Instruments such as Treasury Futures and Options.

## A.    Primary Dealers

39.    Each of the Defendants served as a Primary Dealer during the Class Period, meaning that it was obligated to "participate consistently in open market operations to carry out U.S. monetary policy pursuant to the direction of the Federal Open Market Committee (FOMC); and (ii) provide the New York Fed's trading desk with market information and analysis helpful in the formulation and implementation of monetary policy."[4]

40.    In addition, Primary dealers are "required to participate in all auctions of U.S. government debt and to make reasonable markets for the New York Fed when it transacts on behalf of its foreign official account-holders."[5]

41.    At Treasury Department auctions, Primary Dealers are expected to bid, "at a minimum, their equally weighted share of the auction's total offering size to ensure coverage."[6] For example, since there are currently 22 primary dealers, each primary dealer is required to bid at least 1/22 (4.545%) of the total offering at auction.

42.    Primary Dealers "play an integral role as the Federal Reserve's counterparties in operations to implement monetary policy, as participants in U.S. Treasury auctions, and as important providers of information on market developments to support the [Federal Reserve Bank of New York's Trading] Desk's monitoring of financial markets."[7] Each day, Primary Dealers trade an average of $500 billion in the market for U.S. Treasury Securities.[8]

---

[4] Fed. Res. Bank of New York, *Primary Dealers List* http://www.newyorkfed.org/markets/pridealers_current.html (last visited Aug. 14, 2015).

[5] *Id.*

[6] Potter, *supra* note 3.

[7] *Id.*

[8] *Id.*

**B.      Types of U.S. Treasury Securities**

43.      U.S. Treasury Securities are debt instruments issued by the United States Government that come in five primary types: Treasury Bills, Treasury Notes, Treasury Bonds, Treasury Inflation-Protected Securities ("TIPS"), and Floating Rate Notes ("FRNs"). In 2014, the Treasury Department held 270 public auctions and issued roughly $7 trillion in U.S. Treasury Securities.

44.      Treasury Bills are a form of bond that are sold in increments of $100 and have the shortest term of any Treasury Security, maturing in 4, 13, 26, or 52 weeks. Treasury Bills are issued at a discount and mature at par (face) value, paying interest at the time of maturity in the amount of the sale price (discount rate) less the Treasury Bill's face value. With the exception of the 52-week Treasury Bill which is offered monthly, Treasury Bills are offered weekly.

45.      Treasury Notes are another form of bond and are sold in terms of 2, 3, 5, 7, or 10 years. Treasury Notes are also sold in increments of $100, paying interest semiannually. With the exception of the 10-year Treasury Note which is offered quarterly, Treasury Notes are available at auction on a monthly basis.

46.      Treasury Bonds are identical to Treasury Notes except that they mature in 30 years. Treasury Bonds are offered monthly at auction.

47.      TIPS are also sold in increments of $100 and are available in 5, 10, and 30-year terms. TIPS pay interest twice a year at a fixed rate and protect against inflation by applying the interest rate to the inflation-adjusted (or deflation-adjusted) principal as measured by the Consumer Price Index. At the time of maturity, the holder is paid the greater of the adjusted principal or the original principal.

48.      FRNs were first issued by the Treasury Department in January 2014. They are sold in increments of $100 and are available only in 2-year terms. FRNs pay interest quarterly until maturity in an amount that is based upon discount rates in the auction of 13-week Treasury Bills.

**C.      Treasury Auctions**

49.    U.S. Treasury Securities are purchased at public auctions held by the Treasury Department. The Treasury Department posts a calendar of upcoming auctions indicating the type of security to be auctioned and the date of auction, as illustrated below:[9]

| Tentative Auction Schedule of U.S. Treasury Securities | | | | | |
|---|---|---|---|---|---|
| **Security Type** | | | **Announcement Date** | **Auction Date** | **Settlement Date** |
| 13-Week  BILL | | | Thursday, August 06, 2015 | Monday, August 10, 2015 | Thursday, August 13, 2015 |
| 26-Week  BILL | | | Thursday, August 06, 2015 | Monday, August 10, 2015 | Thursday, August 13, 2015 |
| 4-Week  BILL | | | Monday, August 10, 2015 | Tuesday, August 11, 2015 | Thursday, August 13, 2015 |
| 13-Week  BILL | | | Thursday, August 13, 2015 | Monday, August 17, 2015 | Thursday, August 20, 2015 |
| 26-Week  BILL | | | Thursday, August 13, 2015 | Monday, August 17, 2015 | Thursday, August 20, 2015 |
| 52-Week  BILL | | | Thursday, August 13, 2015 | Tuesday, August 18, 2015 | Thursday, August 20, 2015 |
| 5-Year  TIPS | R | T | Thursday, August 13, 2015 | Thursday, August 20, 2015 | Monday, August 31, 2015 |
| 4-Week  BILL | | | Monday, August 17, 2015 | Tuesday, August 18, 2015 | Thursday, August 20, 2015 |
| 13-Week  BILL | | | Thursday, August 20, 2015 | Monday, August 24, 2015 | Thursday, August 27, 2015 |
| 26-Week  BILL | | | Thursday, August 20, 2015 | Monday, August 24, 2015 | Thursday, August 27, 2015 |
| 2-Year  FRN | R | | Thursday, August 20, 2015 | Wednesday, August 26, 2015 | Friday, August 28, 2015 |
| 2-Year  NOTE | | | Thursday, August 20, 2015 | Tuesday, August 25, 2015 | Monday, August 31, 2015 |
| 5-Year  NOTE | | | Thursday, August 20, 2015 | Wednesday, August 26, 2015 | Monday, August 31, 2015 |
| 7-Year  NOTE | | | Thursday, August 20, 2015 | Thursday, August 27, 2015 | Monday, August 31, 2015 |
| 4-Week  BILL | | | Monday, August 24, 2015 | Tuesday, August 25, 2015 | Thursday, August 27, 2015 |
| 13-Week  BILL | | | Thursday, August 27, 2015 | Monday, August 31, 2015 | Thursday, September 03, 2015 |
| 26-Week  BILL | | | Thursday, August 27, 2015 | Monday, August 31, 2015 | Thursday, September 03, 2015 |
| 4-Week  BILL | | | Monday, August 31, 2015 | Tuesday, September 01, 2015 | Thursday, September 03, 2015 |
| 13-Week  BILL | | | Thursday, September 03, 2015 | Tuesday, September 08, 2015 | Thursday, September 10, 2015 |
| 26-Week  BILL | | | Thursday, September 03, 2015 | Tuesday, September 08, 2015 | Thursday, September 10, 2015 |
| 3-Year  NOTE | | | Thursday, September 03, 2015 | Tuesday, September 08, 2015 | Tuesday, September 15, 2015 |
| 10-Year  NOTE | R | | Thursday, September 03, 2015 | Wednesday, September 09, 2015 | Tuesday, September 15, 2015 |
| 30-Year  BOND | R | | Thursday, September 03, 2015 | Thursday, September 10, 2015 | Tuesday, September 15, 2015 |
| Holiday - Monday, September 07, 2015 - Labor Day | | | | | |

50.    Although the Treasury Department's auction calendar is posted well in advance of a given auction, the Treasury Department does not announce certain details regarding the auction until roughly a week before that auction, such as the amount of the security being offered, the issue date, the maturity date, and the terms and conditions of the offering.

51.    Once an auction is announced, investors may bid on the U.S. Treasury Securities being offered through competitive or noncompetitive bidding, but an entity may not bid competitively in an auction in which it bids noncompetitively.[10]

52.    In noncompetitive bidding, bidders indicate how much of the security they want to purchase and accept whatever market rate is established at the auction. Bidders are guaranteed to

---

[9] U.S. Dep't of the Treasury, Auction Schedule, http://www.treasury.gov/resource-center/data-chart-center/quarterly-refunding/Documents/auctions.pdf.

[10] 31 C.F.R. § 356.12(c)(3).

receive the security desired in the full amount requested up to the maximum bid limit of $5 million per auction. Noncompetitive bidding may account for as little as 1% of the U.S. Treasury Securities sold at a given auction.[11]

53.    In competitive bidding, bidders specify the rate they are willing to accept and the dollar amount they would accept at that rate. Bidders may receive all, part, or none of the security for which they bid, depending upon how their bid compares to the discount rate, yield, or spread set at the auction; however, any single competitive bidder may not be awarded more than 35% of the total offering.

54.    The Defendants, as Primary Dealers, tend to be the most active participants at auction and may account for over 80% of the competitive bids tendered at auction.[12] Notably, such bidding may result in only 55% of U.S. Treasury Securities sold at auction.[13]

55.    Once the bids are received, the Treasury Department sorts and accepts the competitive bids from the lowest rate to the highest rate. The last rate accepted is known as the "stop-out" rate which is the rate used for all successful competitive and noncompetitive bidders.

56.    Roughly two minutes after the auction closes, aggregate information regarding the results of the auction is released to the public.[14] Such information includes: (1) the interest rate; (2) the price; (3) the highest yield offered; (4) the percentage of Treasuries allotted at the high yield; (5) the median yield offered; (6) the low yield offered; (7) aggregate figures of bids tendered and accepted at both competitively and non-competitively; and (8) figures breaking down the bids tendered and accepted based on bidder type (e.g., Primary Dealer, direct bidder, and indirect bidder).[15]

---

[11] *See* Treasury Auction Results, attached as Exhibit A.

[12] *See id.*

[13] *See id.*

[14] Fed. Res. Bank of New York, *Treasury Auctions*, http://newyorkfed.org/aboutthefed/fedpoint/fed41.html (last visited Aug. 13, 2015).

[15] *See* Treasury Auction Results, attached as Exhibit A.

**D.     The When-Issued Market**

57.     As soon as the Treasury Department announces the details of an upcoming auction, trading of such securities begins in a type of forward market known as the "when-issued" market. Trading on a when-issued basis occurs prior to the auction, meaning that before the security is issued, investors make conditional orders to purchase the security. Such orders settle after the security is issued and thus are conditioned on issuance. If the security is not issued, the orders may not be completed.

58.     In the when-issued market, Defendants buy and sell forward contracts for U.S. Treasury Securities with each other and with their customers.

**E.     The Secondary Market**

59.     Once U.S. Treasury Securities are issued at auction, they trade in a secondary market in a similar fashion to other securities.

60.     Trades in this market are increasingly performed electronically using a variety of execution venues with varying sets of rules. However, trades in this market remain off the exchanges (*i.e.*, they are done over-the-counter ("OTC")), and Primary Dealers, such as Defendants, serve as market makers.

**F.     Treasury Futures**

61.     Treasury futures are one of the most liquid financial products available. In 2013, roughly 2.69 million treasury futures contracts were traded each day, with a combined notional value of over $250 billion.[16]

62.     Treasury Futures are derivative financial products that track the price of certain U.S. Treasury Securities and represent an obligation to purchase or sell the underlying security at a certain price on a certain date in the future. Treasury Futures contracts are available on Treasury Bonds (referring to U.S. Treasury Securities with maturities of at least 15 years until

---

[16] CME Group, THE BASICS OF US TREASURY FUTURES, at 4 (Feb. 2014), available at http://www.cmegroup.com/trading/interest-rates/files/basics-of-us-treasury-futures.pdf

delivery), Ultra Treasury Bonds (referring to U.S. Treasury Securities with maturities of at least 25 years until delivery), and on 2, 3, 5, and 10-year Treasury Notes.

63.    Treasury futures are traded on the Chicago Board of Trade ("CBOT") which is run by the Chicago Mercantile Exchange ("CME").

64.    Each Treasury futures transaction has a long (buy) side and short (sell) side. The short position holder agrees to deliver the underlying Treasury security when the futures contract expires, at which time the long position holder agrees to take delivery of the security. If the short seller chooses to deliver the underlying security and does not possess that security, the short seller must cover the position by acquiring the security in the open market. As a result, there is a strong correlation between Treasury futures prices and the prices of U.S. Treasury Securities, which are in turn influenced by pricing of such securities at auction and in the when-issued market.

**G.    Treasury Options**

65.    Treasury options include both OTC options on a particular Treasury Security as well as exchange-traded options on the CBOT. The volume of Treasury options traded daily is generally less than the volume of Treasury futures traded daily, but the comparative volume varies based upon the underlying security.[17]

66.    Treasury Options are available on Treasury Bonds, Ultra Treasury Bonds, and on 2, 5, and 10-year Treasury Notes. Treasury options are also available on Treasury futures.

67.    Both OTC and exchange-traded Treasury options can be written as "calls" (which give the holder the right to buy a Treasury futures contract at a specified price up until a specified date in the future) or as "puts" (which give the holder the right to sell a Treasury futures contract at a specified price up until a specified date in the future).

68.    Because both OTC and exchange-traded Treasury options are based on the pricing of an underlying U.S. Treasury Security, Treasury options contracts are directly affected by the

---

[17] *See* U.S. Treasury-Based Instruments Daily Trading Volume, attached as Exhibit B.

prices of U.S. Treasury Securities, which are in turn influenced by pricing of such securities at auction and in the when-issued market.

## VII. UNLAWFUL CONDUCT

69.     The market for U.S. Treasury Securities is lightly regulated, increasing the opportunity for collusive conduct to go unnoticed.

70.     As Primary Dealers, the Defendants receive a significant volume of material non-public information regarding their clients' orders before auction results are publicly known. In contrast, Plaintiff and members of the Class only have information regarding their own positions and the limited information publically released by the Treasury Department.[18] Plaintiff and the Class reasonably expect published auction information to reflect prices resulting from a fair marketplace free from manipulation or collusion.

71.     A significant information asymmetry is created by the wealth of non-public information received by Defendants in comparison to the limited amount of public information received by Plaintiff and Class Members. This gives Defendants an unfair informational advantage at auction and in the when-issued market.

72.     Defendants can use this non-public information to coordinate positions at auction and in the when-issued market. *Bloomberg* has reported that individual traders working for Defendants "have talked with counterparts at other banks via online chatrooms," and such conduct is believed to have continued at least through 2014.[19] Perhaps for this reason, the Primary Dealers have been regarded as an "insiders club."[20] *Bloomberg* further reported that traders "shared broad guidance" in advance of auctions and that in many instances, traders did

---

[18] *See* Treasury Auction Results, attached as Exhibit A.

[19] Scaggs, Kruger, & Geiger, *supra* note 2.

[20] *Id.*

not follow internal guidelines prohibiting them from discussing client information before auctions.[21]

73.     The exchange of competitively-sensitive information between and among the Defendants allowed them to coordinate bidding strategies at Treasury Department auctions as well as in the when-issued market, thereby suppressing auction prices while increasing prices in the when-issued market which resulted in wider spreads (and thus increased profits) for the Defendants at the expense of Plaintiff, the Class, and the U.S. Government.

74.     Moreover, because prices at auction and in the when-issued market heavily influence prices in the secondary market, which in turn are key inputs for determining the price of U.S. Treasury-Based Instruments, this information asymmetry also affects the secondary market for U.S. Treasury Securities and markets for U.S. Treasury-Based Instruments, leading to artificial pricing in all affected markets.

75.     Further, because Defendants, as Primary Dealers, see orders flowing in for U.S. Treasury Securities at auction and in the when-issued market, they are able to use that information to their benefit in other markets as well, including the secondary market for U.S. Treasury Securities and the markets for U.S. Treasury-Based Instruments.[22]

## VIII. MULTIPLE GOVERNMENT INVESTIGATIONS REVEAL WIDESPREAD MANIPULATION OF FINANCIAL MARKETS AND BENCHMARKS BY DEFENDANTS

76.     In June 2015, various news publications reported that the Department of Justice ("DOJ") had initiated an investigation into possible fraudulent manipulation of the $12.7 trillion Treasury market. As part of its investigation, the DOJ reportedly sent requests for information to Primary Dealers trading U.S. Treasury Securities. The DOJ's investigation is not an isolated one. Rather, it is the latest inquiry into the manipulation of financial markets and benchmarks by

---

[21] *Id.*

[22] *Id.*

major banks, many of which are Primary Dealers. As Professor Jill E. Fisch of the Institute for Law and Economics at the University of Pennsylvania Law School observed in a *Bloomberg Business* article, "[i]t's not just one investigation after another, it's one scandal after another."[23]

77.     In March 2011, government regulators and prosecutors from around the world accused many of the same Defendants named in this Complaint of manipulating LIBOR (*i.e.*, the London Interbank Offered Rate, used by major lenders around the world to set their own interest rates). Since then, government investigations have been ongoing in the United States, United Kingdom, Switzerland, the European Union, Japan, Canada, and Singapore. In the U.S., the DOJ, the Commodity Futures Trading Commission ("CFTC"), and the Securities and Exchange Commission ("SEC") have ongoing parallel investigations. Regulators accused the banks of manipulating LIBOR rates by coordinating submissions and submitting deliberately false quotes for various LIBOR rates to the British Bankers' Association, the organization that collected dealer-bank submissions and calculated the various LIBOR rates. To date, the LIBOR investigations, which revealed evidence of widespread manipulation of LIBOR through private electronic chatrooms, have resulted in guilty pleas and fines in the billions of dollars, including on behalf of certain Defendants or their parent companies. The banks that have been fined thus far include Barclays, UBS, RBS, Deutsche Bank, JPMorgan, and Citigroup. In addition, in 2012, several banks, including UBS, RBS, Deutsche Bank, and Barclays, entered into non-prosecution agreements, barring them from committing crimes in the U.S. for two years.

78.     Subsequent U.S. and foreign investigations into the foreign exchange ("FX") markets revealed similar collusions among a similar group of banks to manipulate financial benchmarks and markets by using closed network chatrooms with incriminating names, such as "The Cartel," "The Bandits Club," and "The Mafia" to coordinate trades and positions. This conduct resulted in additional guilty pleas and billions of dollars in fines paid by many of the

---

[23] Keri Geiger & Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, BLOOMBERG (June 10, 2015), http://www.bloomberg.com/news/articles/2015-06-10/treasuries-collusion-said-to-be-hunted-in-next-wave-of-probes.

Defendants named in this Complaint (or their parent companies), including JPMorgan, Citigroup, Barclays, UBS, and RBS. Barclays, RBS and UBS further agreed that their FX trading and sales practices and collusive conduct in that market constituted federal crimes that violated a principal term of their LIBOR non-prosecution agreements, resulting in additional criminal fines.

79.    In conjunction with the FX investigations and prosecutions, the Federal Reserve announced that it was imposing additional fines on the banks, and Barclays settled related claims with the New York State Department of Financial Services ("DFS"), the CFTC, and the United Kingdom's Financial Conduct Authority ("FCA"). Defendants also entered into settlements with the Office of the Comptroller of the Currency ("OCC") and the Swiss Financial Market Supervisory Authority ("FINMA"), bringing the total fines and penalties paid by these five banks for their conduct in the FX markets to nearly $9 billion. In addition, on August 13, 2015, Barclays, Goldman Sachs, BNP, HSBC, and RBS agreed to settle class action litigation related to their manipulation of FX markets, bringing the total amount paid in private settlements for such conduct to more than $2 billion.

80.    Despite these significant fines and penalties, regulators' subsequent investigations revealed continued collusion by many of the same financial institutions to manipulate the ISDAfix benchmark (the pricing benchmark for the fixed rate portion of interest rate swaps), including communications between banks' trading desks and with third party brokers to request that artificial pressure be exerted on the ISDAfix at specific times to benefit one trading party at the expense of its counterparty. In conjunction with the CFTC's investigation of the ISDAfix conspiracy, the CFTC found that the banks used various code words to communicate with each other. For example, Barclays traders referred to the swap trades they placed to move the benchmark as "ammo" or as amounts the traders could "burn," "waste," or "use" to "get the print" or "affect" the "fix." The CFTC further found that "certain traders at Barclays attempted to manipulate USD ISDAFIX by making false submissions for Barclays as a panel bank . . . skewing the rates and spreads submitted in the direction that could have moved USD ISDAFIX

setting to benefit the Bank's trading positions."[24] In May 2015, Barclays agreed to pay $115 million to settle charges by the CFTC that it attempted to manipulate the ISDAfix and was ordered to stop any further violations and take steps to detect and deter further swap-market manipulation. In connection with the CFTC investigation of ISDAfix, the CFTC released an email indicating that traders used U.S. Treasury Securities as part of their scheme to manipulate and influence ISDAfix.

## IX. CLASS ALLEGATIONS

81.     Plaintiff brings this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of itself and the following Class:

> All persons and entities that transacted in U.S. Treasury
> Instruments during the Class Period, excluding the Defendants and
> their employees, subsidiaries, parents, affiliates, joint venturers,
> and co-conspirators, the United States Government, and any judge
> or jurors assigned to this case.

82.     The Class is individually so numerous that joinder of all members is impracticable. Even though the exact number of members of the Class is unknown at this time, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least thousands of members in the Class and that their identities can be readily ascertained from records in the possession of the Defendants and their co-conspirators, members of the Class, and public records.

83.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class were directly harmed by Defendants' unlawful and anticompetitive conduct and sustained damages as a result. Defendants' unlawful and anticompetitive conduct, the impact of such conduct, and the relief sought are all issues or questions that are common to Plaintiff and the Class.

---

[24] *In the Matter of Barclays PLC, et al.*, CFTC Docket No. 15-25, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 3 (May 20, 2015).

84.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action and antitrust litigation. Plaintiff's interests are coincident with, and not antagonistic to, the interests of the Class.

85.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members.

86.     The questions of law and fact common to the Class include, but are not limited to:

(a)     Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the prices for U.S. Treasury Instruments in violation of the Sherman Act;

(b)     Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the prices for U.S. Treasury Instruments in violation of the CEA;

(c)     The identity of the participants in the conspiracy;

(d)     The duration of the conspiracy;

(e)     The nature of the conspiratorial conduct of Defendants and their co-conspirators;

(f)     Whether the conspiratorial conduct of Defendants and their co-conspirators injured Plaintiff and members of the Class;

(g)     Whether Defendants and their co-conspirators fraudulently concealed the existence of the conspiracy;

(h)     The appropriate measure of damages sustained by Plaintiff and members of the Class; and

(i)     Whether Plaintiff and members of the Class are entitled to injunctive relief.

87.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of each Class is impracticable.

88.     The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and the parties, and it would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the members of the Class. A class action would achieve substantial economies of time, effort, and expense, and it would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness. There will be no material difficulty in the management of this action as a class action on behalf of the Class.

## X. FRAUDULENT CONCEALMENT

89.     Defendants and their co-conspirators concealed their conspiracy, tolling the statutes of limitations relating to the claims for relief alleged below.

90.     Defendants and their co-conspirators were able to conceal their collusion because of their control over the market for U.S. Treasury Securities due in part to their roles as Primary Dealers. Neither Plaintiff nor class members knew of Defendants' and their co-conspirators' unlawful and self-concealing conduct and could not have discovered them by the exercise of reasonable due diligence.

91.     Defendants and their co-conspirators' conduct concerning their manipulation was so well hidden that Defendants and their co-conspirators kept U.S. regulators unaware of such conduct for years. Defendant' and their con-conspirators' conspiracy could not have been reasonably discovered prior to the public reports disclosing the DOJ's investigation of the U.S. Treasury Securities market. Plaintiff and class members had no means to identify the wrongdoers or calculate damages before that date. Only after recent public reports disclosed DOJ's investigation of the U.S. Treasury Securities market did Plaintiff have a sufficient basis to investigate possible manipulation of that market.

92.     Reasonable due diligence could not have uncovered Defendants' and their co-conspirators' manipulative conspiracy because: (i) the Treasury Department auctions were held out as being set by an impartial auction based on market factors; (ii) Defendants' bids in the Treasury Department auctions are secret and not publicly available; (iii) Defendants' and their

co-conspirators' trading positions and trading strategies in the when-issued market are not publicly available; (iv) the bilateral, non-exchange traded nature of when-issued market transactions makes it difficult to observe anti-competitive or manipulative behavior in that market; (v) the highly specialized and esoteric nature of the different aspects of the U.S. Treasury Securities market makes it extraordinarily difficult for an ordinary person to assess improprieties; and (vi) neither Defendants nor their co-conspirators told Plaintiff or other class members that they were conspiring to fix, stabilize, maintain, or otherwise manipulate the prices of U.S. Treasury Securities during the when-issued market or at Treasury Department auctions.

93.     Defendants and their co-conspirators also took active steps to conceal evidence of their misconduct from Plaintiff, class members, regulators, and the public, including: (i) holding out their activities in the when-issued market and at auction as good faith market-making conduct; (ii) maintaining the secrecy of their price-fixing scheme; (iii) avoiding any discussion in public fora of their collusive activities and manipulation of the when-issued market and Treasury Department auctions; and (iv) using non-public proprietary electronic communication platforms (*e.g.*, instant messaging, electronic chatrooms, etc.) to coordinate trading strategies in the when-issued market and at auction.

94.     In addition, Defendants and their co-conspirators failed to have the proper internal controls in place to detect misconduct concerning the manipulation of the U.S. Treasury Securities market, making detection all the more difficult.

95.     As a result of Defendants' and their co-conspirators' affirmative steps to conceal their improper conduct; their willful decision not to put in place proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and the resulting lack of public information about material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations was tolled for Plaintiff's claims.

## XI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### Agreements Restraining Trade

96.    Plaintiff incorporates and re-alleges the factual allegations set forth in this Complaint.

97.    Defendants and their co-conspirators entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

98.    During the Class Period, Defendants were competitors in the markets for U.S. Treasury Securities and U.S. Treasury-Based Instruments. Nevertheless, Defendants shared with each other competitively-sensitive data, such as client order flow and their own respective desire to manipulate prices in the U.S. Treasury Securities market.

99.    Prices of U.S. Treasury Securities were distorted by Defendants' attempts to manipulate the auction process and when-issued prices for U.S. Treasury Securities. As a result, Plaintiff and members of the Class were deprived of the benefit of a fully competitive market for U.S. Treasury Securities.

100.    Similarly, prices of U.S. Treasury-Based Instruments did not reflect competitive market rates because the prices of these instruments were tied to the prices of U.S. Treasury Securities, which, due to Defendants' collusive, manipulative, anticompetitive, and unlawful conduct, were distorted.

101.    Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act. The conspiracy involved joint coordination among horizontal competitors to affect the prices of U.S. Treasury Securities auctioned by the Treasury Department. Moreover, the conspiracy resulted in substantial anticompetitive effects in the secondary market for U.S. Treasury Securities and the market for U.S. Treasury-Based Instruments. There is no legitimate business justification for, nor are any procompetitive benefits caused by, Defendants' conspiracy and the acts taken in

furtherance thereof. Any ostensible procompetitive benefits of the conspiracy were pretextual and could have been achieved by less restrictive means.

102.   As a direct, material, and proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, Plaintiff and members of the Class have suffered injury to their business or property, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), throughout the Class Period.

103.   Plaintiff and members of the Class are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

104.   Plaintiff and members of the Class are also entitled to an injunction against Defendants preventing and restraining further violations, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

### SECOND CLAIM FOR RELIEF
### Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*

105.   Plaintiff incorporates and re-alleges the factual allegations set forth in this Complaint.

106.   Defendants, through the manipulative acts alleged in this Complaint, specifically intended to, and did in fact, manipulate prices of U.S. Treasury Instruments in violation of Sections 6(c) and 9(a) of the CEA, 7 U.S.C. §§ 9 and 13(a), and 17 C.F.R. § 180.2 promulgated thereunder.

107.   Defendants intended that their wrongful acts would result in prices of exchange-traded U.S. Treasury Instruments being artificially priced during the Class Period.

108.   Defendants, due to their roles as Primary Dealers of U.S. Treasury Securities, their roles as market makers in that market, and their volume of trading in that market, had the ability to influence prices of U.S. Treasury Instruments.

109.   As a result of Defendants' conduct, Defendants caused the prices of U.S. Treasury Instruments to be artificially priced during the Class Period.

110.    Members of the Class who transacted in U.S. Treasury Instruments during the Class Period did so at artificial prices resulting from Defendants' manipulation in violation of the CEA.

111.    Defendants' conduct violated Sections 6(c) and 9(a) of the CEA, 7 U.S.C. §§ 9 and 13(a), and 17 C.F.R. § 180.1 promulgated thereunder.  As such, Defendants are liable for damages pursuant to Section 22 of the CEA, 7 U.S.C. § 25.

**THIRD CLAIM FOR RELIEF**
**Employment of Manipulative or Deceptive Device or Contrivance in Violation of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.***

112.    Plaintiff incorporates and re-alleges the factual allegations set forth in this Complaint.

113.    Defendants, through their manipulative acts alleged in this Complaint, specifically intended to, and did in fact, manipulate prices of U.S. Treasury Instruments, including U.S. Treasury futures and options traded on the CBOT, in violation of Sections 6(c)(1) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9(1) and 13(a)(2), and 17 C.F.R. § 180.1 promulgated thereunder.

114.    Defendants intended that their wrongful acts would result in prices of exchange-traded U.S. Treasury Instruments being artificially priced during the Class Period.

115.    Defendants, due to their roles as Primary Dealers of U.S. Treasury Securities, their roles as market makers in that market, and their volume of trading in that market, had the ability to influence prices of U.S. Treasury Instruments.

116.    As a result of Defendants' conduct, Defendants caused the prices of U.S. Treasury Instruments to be artificially priced during the Class Period.

117.    In violation of CEA Section 6(c)(1), and 17 C.F.R. § 180.1, Defendants and co-conspirators also caused to be delivered for transmission false or misleading or inaccurate reports in connection with the Treasury Department auctions by fixing the bids during these auctions, thereby causing them to reflect artificial, non-competitive pricing information for these securities. Defendants and co-conspirators did so either knowingly, intentionally, or acting in reckless

disregard of the fact that such reports were false, misleading or inaccurate. Defendants also violated CFTC Rule 180.1 by deceiving their customers in the when-issued market through the sale of price-fixed when-issued U.S. Treasury Securities. Customers in the when-issued market had a reasonable expectation that the prices of when-issued U.S. Treasury Securities would be reflective of natural market forces. By selling price-fixed U.S. Treasury Securities to their unwitting customers, Defendants undermined their customers' reasonable expectations of a fair marketplace free from manipulation and collusion.

118.    Members of the Class who transacted in U.S. Treasury Instruments during the Class Period did so at artificial prices resulting from Defendants' manipulation in violation of the CEA.

119.    Defendants' conduct violated Sections 6(c) and 9(a) of the CEA, 7 U.S.C. §§ 9 and 13(a), and 17 C.F.R. §§ 180.1 promulgated thereunder. As such, Defendants are liable for damages pursuant to Section 22 of the CEA, 7 U.S.C. § 25.

### FOURTH CLAIM FOR RELIEF
### Principal-Agent Liability in Violation of the Commodity Exchange Act

120.    Plaintiff incorporates and re-alleges the factual allegations set forth in this Complaint.

121.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the conduct of their agents, representatives, and other persons acting for them in the scope of their employment or office.

122.    As a result of Defendants' liability for the unlawful conduct of their agents, representatives, and other persons acting for them in the scope of their employment or office, Defendants are liable for damages pursuant to Section 22 of the CEA, 7 U.S.C. § 25.

### FIFTH CLAIM FOR RELIEF
### Aiding and Abetting Manipulation in Violation of the Commodity Exchange Act

123.    Plaintiff incorporates and re-alleges the factual allegations set forth in this Complaint.

124.    Each Defendant is liable under Section 13 of the CEA, 7 U.S.C. § 13c, as a principal violator of the CEA due to each Defendants' willful aiding, abetting, counseling, commanding, or inducing the violations of the CEA described in this Complaint.

125.    Each Defendant is further liable under Section 13 of the CEA, 7 U.S.C. § 13c, as a principal violator of the CEA due to each Defendants' actions in combination or concert with other Defendants in order to effect the violations of the CEA described in this Complaint.

126.    As a result of Defendants' liability for aiding and abetting the violations described in this Complaint, and for the unlawful conduct of their co-conspirators, Defendants are liable for damages pursuant to Section 22 of the CEA, 7 U.S.C. § 25.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the members of the Class hereby respectfully request that:

A.    The Court certify this action as a Class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.    Appoint Plaintiff as Class Representative for the Class and its counsel of record as lead class counsel;

C.    The unlawful conduct alleged in this Complaint be adjudged and decreed to violate Section 1 of the Sherman Act and the CEA.

D.    That Defendants are permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged in this Complaint and that the Court direct such other equitable relief as may be appropriate;

E.    That the Court award Plaintiff and the Class treble damages for violations of Section 1 of the Sherman Act.

F.    That the Court award Plaintiff and the Class damages for violations of the CEA.

G.    That the Court award Plaintiff and the Class their costs of this suit, including reasonable attorneys' fees, as provided by law;

H.     Plaintiff and the Class be awarded pre- and post-judgment interest at the highest legal rate accruing from the earliest date permitted by law; and

J.     Plaintiff and the Class be afforded any additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


DATED: August 17, 2015
New York, New York

Respectfully Submitted,

*/s/ Robert N. Kaplan*

Robert N. Kaplan
Frederic S. Fox
Donald R. Hall
Richard J. Kilsheimer
Gregory K. Arenson
Lauren I. Dubick
Jason A. Uris
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
rkaplan@kaplanfox.com
ffox@kaplanfox.com
dhall@kaplanfox.com
rkilsheimer@kaplanfox.com
garenson@kaplanfox.com
ldubick@kaplanfox.com
juris@kaplanfox.com

*Counsel for Plaintiff Oklahoma Firefighters Pension and Retirement System and the Proposed Class*

**Exhibit A**

# TREASURY NEWS



Department of the Treasury • Bureau of the Fiscal Service

For Immediate Release
August 10, 2015

CONTACT: Treasury Securities Services
202-504-3550

## TREASURY AUCTION RESULTS

| Term and Type of Security | | 91-Day Bill |
|---|---|---|
| CUSIP Number | | 912796FG9 |
| | | |
| High Rate [1] | | 0.125% |
| Allotted at High | | 77.94% |
| Price | | 99.968403 |
| Investment Rate [2] | | 0.127% |
| | | |
| Median Rate [3] | | 0.110% |
| Low Rate [4] | | 0.100% |
| | | |
| Issue Date | | August 13, 2015 |
| Maturity Date | | November 12, 2015 |

| | Tendered | Accepted |
|---|---|---|
| Competitive | $86,956,678,500 | $23,530,241,100 |
| Noncompetitive | $369,902,000 | $369,902,000 |
| FIMA (Noncompetitive) | $100,000,000 | $100,000,000 |
| **Subtotal [5]** | **$87,426,580,500** | **$24,000,143,100 [6]** |
| | | |
| SOMA | $0 | $0 |
| | | |
| **Total** | **$87,426,580,500** | **$24,000,143,100** |

| | Tendered | Accepted |
|---|---|---|
| Primary Dealer [7] | $71,990,000,000 | $12,861,290,000 |
| Direct Bidder [8] | $4,715,000,000 | $1,133,970,000 |
| Indirect Bidder [9] | $10,251,678,500 | $9,534,981,100 |
| **Total Competitive** | **$86,956,678,500** | **$23,530,241,100** |

[1] All tenders at lower rates were accepted in full.
[2] Equivalent coupon-issue yield.
[3] 50% of the amount of accepted competitive tenders was tendered at or below that rate.
[4] 5% of the amount of accepted competitive tenders was tendered at or below that rate.
[5] Bid-to-Cover Ratio: $87,426,580,500/$24,000,143,100 = 3.64
[6] Awards to TreasuryDirect = $248,399,500.
[7] Primary dealers as submitters bidding for their own house accounts.
[8] Non-Primary dealer submitters bidding for their own house accounts.
[9] Customers placing competitive bids through a direct submitter, including Foreign and International Monetary Authorities placing bids through the Federal Reserve Bank of New York.

**Exhibit B**

# U.S. Treasury-Based Instruments Daily Trading Volume

### 2-Year T-Note Futures and Options Daily Trading Volume (2015)[25]



### 5-Year T-Note Futures and Options Daily Trading Volume (2015)[26]



### 10-Year T-Note Futures and Options Daily Trading Volume (2015)[27]

[25] CME Group, 2-Year T-Note Volume (Aug. 14, 2015), http://www.cmegroup.com/trading/interest-rates/us-treasury/10-year-us-treasury-note_quotes_volume_voi.html.

[26] CME Group, 5-Year T-Note Volume (Aug. 14, 2015), http://www.cmegroup.com/trading/interest-rates/us-treasury/10-year-us-treasury-note_quotes_volume_voi.html.

[27] CME Group, 10-Year T-Note Volume (Aug. 14, 2015), http://www.cmegroup.com/trading/interest-rates/us-treasury/10-year-us-treasury-note_quotes_volume_voi.html.



**T-Bond Futures and Options Daily Trading Volume (2015)**[28]



**Ultra T-Bond Futures and Options Daily Trading Volume (2015)**[29]



---

[28] CME Group, U.S. Treasury Bond Volume (Aug. 14, 2015),
http://www.cmegroup.com/trading/interest-rates/us-treasury/10-year-us-treasury-
note_quotes_volume_voi.html.

[29] CME Group, Ultra U.S. Treasury Bond Volume (Aug. 14, 2015),
http://www.cmegroup.com/trading/interest-rates/us-treasury/10-year-us-treasury-
note_quotes_volume_voi.html.